COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
Email: marco@coastlawgroup.com

SAN DIEGO COASTKEEPER
PATRICK MCDONOUGH (SBN 288285)
COURTNEY BROWN (SBN 360257)
8305 Vickers Street, Suite 209
San Diego, CA 92111
Ph: (619) 609-0860
Email: patrick@sdcoastkeeper.org

Attorneys for Plaintiffs COASTAL ENVIRONMENTAL RIGHTS FOUNDATION and SAN DIEGO COASTKEEPER

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>OLD SCHOOL IRON, INC.; a California Corporation,<br><br>Defendant. | Civil Case No. '26CV4424 JLS SBC<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*.)** |

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I. <u>JURISDICTION AND VENUE</u>

1. This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2. On May 15, 2026, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Old School Iron, Inc. ("Defendant" or "Old School") as the owner and/or operator of the Facility located at 2609 Industry Street, Oceanside, California 92054 ("Facility"), regarding its violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 2014-0057-DWQ as amended by Order 2015-0122-DWQ & Order 2018-0028-DWQ (effective July 1, 2020) ("Permit," "IGP," or " Industrial General Permit"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3. Plaintiffs mailed the Notice Letter to the Facility's physical address, 2609 Industry Street, Oceanside, California 92054, and to Defendant's Agent for Service of Process at 1108 Evergreen Lane, Vista, California 92084 via certified mail.

4. Plaintiffs also mailed the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

5. More than sixty (60) days have passed since the Notice Letter was served on

Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

6. Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II. INTRODUCTION

7. Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the Facility.

8. Defendant has discharged and continues to discharge polluted storm water from the Facility to downstream waters and groundwater including Loma Alta Creek, Loma Alta Slough, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

9. Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge, and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the CWA and the IGP.

10. With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

11. Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of birds and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

12. This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

13. Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

14. The polluted discharges from the Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Plaintiffs' members' use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation. Plaintiffs and their members also use and enjoy the Receiving Waters for educational opportunities, developing educational tools, habitat monitoring, restoration activities, and other scientific studies, which are also negatively impacted by the Defendant's IGP and Clean Water Act violations as described herein.

## III. PARTIES

15. Old School Iron, Inc. is an active California Corporation and is the Owner and/or Operator of the Facility.

16. Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands, and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation.

17. CERF is a non-profit public benefit corporation organized under the laws of

the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

18. Many of Plaintiffs' members live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies and restoration efforts, among other activities.

19. Plaintiffs and their members have an interest in accurate information about Defendant's discharges. Defendant's failure to accurately report and monitor impedes Plaintiffs' abilities to carry out their missions, and Plaintiffs' members' ability to fully use and enjoy the Receiving Waters for aesthetic, recreational, scientific, educational, and spiritual purposes.

20. Defendant's failure to comply with the procedural and substantive requirements of the IGP and the CWA results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters and thus impair Plaintiffs' and their members' use and enjoyment of those waters.

21. The violations of the IGP and CWA at the Facility are ongoing and continuous. Thus, the interests of Plaintiffs and their members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

22. The relief sought herein will redress the harms to Plaintiffs and their members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

23. An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

## IV. LEGAL BACKGROUND

### A. The Clean Water Act.

24. The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

25. Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

26. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

27. "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

28. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 122.2; 80 F.R. § 37054.

29. The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue is relatively permanent. Adjacent wetlands are jurisdictional have a continuous surface connection directly touching a relatively permanent jurisdictional water.

30. The Pacific Ocean is a traditionally navigable water, and is therefore a water of the United States.

31. Loma Alta Slough is traditionally navigable, directly connected to the Pacific Ocean, and is seasonally tidal. Therefore, it is a water of the United States.

32. Loma Alta Creek is a tributary to Loma Alta Slough, which flows year-round, and shares a continuous surface connection with Loma Alta Slough. Therefore, it

is a water of the United States.

33. The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)–(iii).

34. Private citizens may sue under the Clean Water Act to enforce the specific provisions of California's Industrial General Permit. 33 U.S.C. § 1365(a)(1), (f)(6); *Russian River Watershed Prot. Comm. v. City of Santa Rosa,* 142 F.3d 1136, 1139 (9th Cir.1998).

**B. California's IGP.**

35. Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

36. California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

37. The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

38. On July 1, 2015, the current IGP became effective pursuant to *Order No. 2014-0057-DWQ.*

39. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018*, the reissued IGP took effect.

40. In order to discharge storm water lawfully in California, certain industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. Permit § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a

Notice of Intent to Comply with the IGP ("NOI") to the State Board. *Id.* § I.A.17.

41. Industrial activities covered under the IGP are described in Attachment A. Facilities with SIC code 3441 are required to enroll in the Permit. *Id.*, Attachment A.

42. Violations of the IGP are violations of the Clean Water Act. *Id.* § XXI.A.

**C. The IGP Discharge Prohibitions.**

43. The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this [Industrial] General Permit or another NPDES permit." *Id.* § III.A.

44. The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges" or "NSWDs"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *Id.* § III.B.

45. These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. *Id.* § III.C.

46. The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. *Id.* § III.D.

47. The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives." Basin Plan at 4-20.

48. Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Permit Discharge Prohibition III.D.

**D. The IGP Effluent Limitations.**

49. The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. Permit § V.A.

50. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

51. Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); Permit § V.A.

52. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The 2021 MSGP went into effect on March 1, 2021. The EPA Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* 2021 MSGP, 86 Fed. Reg. 10,269 (Feb. 19, 2021); *see also* 2021 MSGP Fact Sheet at 78.

53. Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

54. Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); Permit § V.A.

**E. The IGP Receiving Water Limitations.**

55. The IGP Receiving Water Limitations prohibit storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. Permit § VI.B.

56. Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

57. The IGP Receiving Water Limitations prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. *Id.* § VI.A.

58. Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33 U.S.C. § 1313(c)(2)(A).

59. WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

60. The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act Section 303. 40 C.F.R. § 131.

61. The Beneficial Uses for Loma Alta Creek include: municipal and domestic supply; non-contact water recreation; warm freshwater habitat; and wildlife habitat. Basin Plan, Table 2-2.

62. The Beneficial Uses for the Basin Plan for Loma Alta Sough include: contact water recreation; non-contact water recreation; estuarine habitat; wildlife habitat; rare, threatened or endangered species; and marine habitat. Basin Plan, Table 2-3.

63. The Beneficial Uses for the Pacific Ocean include: industrial service supply; navigation; contact and non-contact recreation; commercial and sports fishing; preservation of biological habitats of special significance; wildlife habitat; rare, threatened, or endangered species; marine habitat; aquaculture; migration of aquatic organisms; spawning, reproduction, and/or early development; and shellfish harvesting. Basin Plan, Table 2-3.

64. Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

According to the current 303(d) List of Impaired Water Bodies, Loma Alta Creek is impaired for Phosphorus, Selenium, Toxicity, Pyrethroids, Bifenthrin, Cyfluthrin, Cyhalothrin, Lambda, Benthic Community Effects, Indicator Bacteria, and Nitrogen. Loma Alta Slough is impaired for eutrophic conditions and indicator bacteria. The Pacific Ocean shoreline near Loma Alta Creek is impaired for trash and indicator bacteria. California 2024 Integrated Report.

65. Polluted discharges from industrial facilities, such as the Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

66. Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQSs, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* Permit § VI.A.

**F. The IGP Storm Water Pollution Prevention Plan Requirements.**

67. Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). *Id.* §§ X.A–B.

68. The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id.* § X.

69. The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs

to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. *Id.* §§ X.A–I.

70. Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. Permit §§ I.K.69, X.A.9, X.B.1. The IGP requires dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. Permit § X.B.2.

71. The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. *Id.* § XV.

**G. The IGP Monitoring and Reporting Requirements.**

72. Permittees must develop and implement a monitoring implementation plan ("MIP"). *Id.* §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Permit §§ X.I, X, I.K.69–70.

73. The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. Permit Fact Sheet § J at 138.

74. Permittees must conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. Permit § XI.A.1.

75. A qualifying storm event ("QSE") is a precipitation event that produces a

discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area. *Id.* § XI.B.1.

76. The Reporting Year is defined as July 1 through June 30. Permit § I.N.76.b. Permittees must collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30). *Id.* § XI.B.2.

77. Permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results. *Id.* § XI.B.11.

78. Permittees must analyze samples for TSS, O&G, and pH, at a minimum. *Id.* § XI.B.6.a–b.

79. Permittees must analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants. *Id.* § XI.B.6.c.

80. Permittees must analyze storm water samples for all applicable parameters required by the Facility's SIC code, as set forth in Table 1 of the IGP. *Id.* § XI.B.6.d.

81. Permittees must analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. *Id.* § XI.B.6.e.

82. Permittees must submit an annual report to the applicable Regional Board by July 15 of each year. The Annual Report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

83. All reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy. *Id.* § XXI.K.

# V. FACTUAL BACKGROUND

## A. Facility Site Information, Industrial Activities, and Pollutant Sources.

84. The SMARTS database indicates Defendant has been covered under the IGP since at least May 9, 2017 to conduct industrial operations at the Facility, under Waste Discharge Identification ("WDID") Number 9 37I027156.

85. The Facility's Standard Industrial Classification ("SIC") code is 3441 (Fabricated Structural Metal Work), which requires Permit coverage.

86. According to the Facility's NOI, the Facility consists of approximately 0.85 acres, which of approximately 0.74 acres is exposed to storm water.

87. The Facility expanded onto its former neighbor's parcel and now covers a 1.2-acre lot. SWPPP at 8.

88. According to information available to Plaintiffs, the Facility is uncovered and industrial activities take place throughout, without cover.

89. The Facility fabricates pre-formed iron and steel for structural purposes. SWPPP at 8. This involved fabricating, welding, cutting, grinding, drilling, and painting. According to the updated Site Map, the Facility occupies the entire 1.2 acre parcel and is almost completely pervious. The Facility is comprised of an indoor office, outdoor storage yard, material processing and material handling, shipping and receiving, waste disposal, "wash area," and vehicle storage. *See* Site Map.

90. According to the Facility SWPPP, raw steel components are delivered to the facility where they are handled and processed in the yard and stored in stockpiles as needed. Scrap metal generated during fabrication is purportedly collected in an outdoor bin and hauled off-site for recycling. SWPPP at 10.

91. According to the Facility SWPPP, vehicle and equipment storage, maintenance, and repair also occur on-site. SWPPP at 16. The Facility SWPPP fails to elaborate on industrial activities and materials and associated pollutants that stem from these activities and materials.

92. The Facility's SWPPP acknowledges potential pollutant sources associated

with its industrial activities include TSS, oil and grease, heavy metals, paints, iron, aluminum, and zinc. SWPPP at Table 2.1.

93. The Facility's SWPPP fails to detail which heavy metals are associated with the Facility's painting operations. SWPPP at Table 2.1.

94. Samples of the Facility's discharge obtained by CERF on February 19, 2026 from the northern driveway onto Industry Street reflected high concentrations of (1) metals such as manganese, aluminum, copper, iron, and zinc, (2) p-H affecting substances in excess of applicable water quality standards and EPA benchmarks promulgated to protect human health and the environment., and (3) nutrients such as phosphorus and nitrogen. Ex. 1, Summary of CERF's Storm Water Sampling Data.

95. The U.S. EPA Industrial Stormwater Fact Sheet for Sector AA further indicates that pollutants associated with the Facility's industrial activities and materials related to concrete production include steel scraps, aluminum scraps, brass, copper, dust, chips and borings, steel scale, Teflon, manganese, paint wastes, thinner, varnish, heavy metals, spent chlorinated solvents, aluminum, lead, zinc, copper, iron, oxide, oil, nickel, manganese, nickel, cadmium, chromium, and many others *Available at*, https://www.epa.gov/sites/default/files/2015-10/documents/sector_aa_fabmetal.pdf.

96. Storm water discharges from the Facility enter the County of San Diego storm sewer system ("MS4"), and thereafter flow into the Loma Alta Creek, Loma Alta Slough, and the Pacific Ocean.

97. Industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

98. Many pollutants associated with industrial activities occurring at the Facility regularly escape via spills, dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

99. Pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking pollutants off-site, and aerial deposition of pollutants throughout the Facility as well as offsite.

100. One or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires IGP coverage.

101. Even if regulated industrial activities are not conducted at all locations throughout the entire Facility, the Facility lacks BMPs or other controls that would adequately separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

102. Due to both the Facility's lack of BMPs, and inadequacy of existing BMPs, storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and non-storm water commingles with storm water, and thus all discharges from the Facility are regulated under the IGP.

103. Industrial activities at the Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the Facility, discharged from the Facility, and eventually flow to Receiving Waters.

104. The Facility's site map fails to accurately note the directions of storm water flow, on-site storm water retention systems, identify discharge locations, or delineate grade breaks and drainage areas. However, based on visual observations, the site map erroneously notes that the storm water flows southwesterly across the facility to a single discharge point. According to visual observations and collection of storm water samples of the Facility's discharge at the northwestern driveway on February 19, 2026. All runoff at the Facility is either retained or discharges into the County of San Diego's MS4 system. *See* Ex. 1.

**B. The Facility Discharges Contaminated Storm Water in Violation of the IGP.**

105. With every significant rain event, the Facility discharges polluted storm water into the Receiving Waters.

106. The Receiving Waters into which the Defendant discharges polluted storm water are waters of the United States and therefore the IGP properly regulates discharges to those waters.

107. Storm water and non-storm water discharges from the Facility violate the Discharge Prohibitions and Effluent Limitations of the IGP.

**1. Discharges of Polluted Storm Water from the Facility Violate IGP Discharge Prohibitions.**

108. The Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of IGP. *See* Permit § III.C.

109. The California Water Code defines “contamination” as “an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease.”

110. “Pollution” is defined as “an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses.”

111. CERF’s sampling data show discharges with high concentrations of (1) metals such as manganese, aluminum, copper, iron, and zinc, (2) pH-affecting substances in excess of applicable water quality objectives, benchmarks, and other standards that were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters, and (3) nutrients such as phosphorus and nitrogen. Such discharges of polluted storm water violate the Permit. *See* Ex. 1. These polluted discharges cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Discharge Prohibition III.C.

112. The Facility's storm water discharges from the eastern part of the facility likely contain even higher concentrations of the tested pollutants than reflected in CERF's February 19, 2026 sample.

113. Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

114. "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

115. Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2020 IGP.

116. Information available to Plaintiffs, including its review of publicly available information and observations, indicates that no express allowance for dilution has been granted to the Facility's discharges or to the downstream Receiving Waters.

117. Thus, CERF's monitoring data demonstrates the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D.

118. Upon information and belief, including the likelihood of the presence of many additional pollutants described in Section V.A, *supra*, the Facility has discharged and continues to discharge numerous additional pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D.

119. Each time the Facility discharges polluted storm water or non-storm water in violation of Sections III.C and III.D of the Discharge Prohibitions provisions of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

120. These Discharge Prohibition violations are ongoing and will continue every

time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

121. The Facility has been in violation of these Discharge Prohibitions since at least May 15, 2021 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time. *See* Ex. 1 (setting forth dates of all precipitation events during the past five years).

**2. Discharges of Polluted Storm Water from the Facility Violate IGP Effluent Limitations.**

122. Defendant has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* Permit § V.A.

123. CERF's storm water monitoring data indicates that the Facility's storm water discharges exceed the EPA Benchmarks or Annual NALs for copper, zinc, and aluminum. *See* Ex. 1. For example, on February 19. 2026, the Facility's discharge contained zinc of .27 mg/L, which is over double the EPA benchmark of .12 mg/L. *Id.*

124. The February 19, 2026 sample of the Facility's discharge also contained concentrations of copper at 0.015 mg/L, over two and a half times higher than the EPA benchmark of 0.0059 mg/L.

125. As discharges containing pollutant concentrations that exceed EPA Benchmarks indicate the Facility has not developed and/or implemented BMPs that meet BAT/BCT requirements, the sampling data collected strongly indicates the Facility has failed and continues to fail to develop and/or implement BMPs that comply with the BAT/BCT requirements.

126. According to the Facility's SWPPP, the Facility is to implement good housekeeping BMPs, including sweeping and inspecting metal cutting areas at least weekly, covering outdoor waste bins when not in use, and placing tarps over inactive final produce piles to reduce exposure. 2026 SWPPP at 16-25, Section 3.1.1. In addition, liquids are to be stored indoors, waste containers are to be kept covered when not in use,

and trash is to be picked up at the end of each workday. 2026 SWPPP at 18-19.

127. However, visual observations and photographs of the Facility from February 19, 2026 and July 8, 2026, confirm that it lacks BMPs that would achieve BAT/BCT. As indicated in Exhibit 1, these observations, during dry and wet weather events, show extensive rusty materials outside, in the rain, uncovered, or poorly covered, open trash receptacles, uncovered containers of liquid, and spare tires. Sediment and pollutant track-out is also visible at the Facility driveway.

128. Direct observations, photographs, and City of Oceanside inspection records confirm the Facility routinely leaves rusty metal materials left uncovered and exposed to precipitation. *Id.* In November 2023, the City of Oceanside noted the Facility was non-compliant for "Proper Outdoor Storage of Materials, Equipment, and Haz. Mat." The Facility required corrective action to cover and elevate metals stored outdoors.

129. According to visual observations, the Facility has failed, and continues to fail, to comply with this directive.

130. The Facility's failure to implement good housekeeping BMPs violates the BAT/BCT requirements of the Permit. Thus, the Defendant has failed, and continues to fail, to develop and implement BMPs that meet BAT/BCT requirements, in violation of the Industrial General Permit.

131. Each time Defendant discharges polluted storm water in violation of Effluent Limitation V.A of the Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

132. These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

133. The Facility has been in violation of these Effluent Limitations since at least May 15, 2021 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

/ / /

**C. Discharges of Polluted Storm Water from the Facility Violate IGP Receiving Water Limitations.**

134. The Facility has violated and continues to violate IGP Receiving Water Limitations.

135. The Receiving Waters are impaired, and thus unable to support designated Beneficial Uses, for some of the same pollutants discharged by the Facility.

136. CERF's storm water sampling data demonstrates the Facility has discharged (1) metals such as manganese, aluminum, copper, iron, and zinc, (2) pH-affecting substances in excess of respective Basin Plan Water Quality Objectives and/or CTR, and (3) nutrients such as phosphorus and nitrogen. *See* Ex. 1. Because the Facility has not collected a single sample since the 2018-2019 reporting year, its potential discharge of these parameters at levels above the Basin Plan and/or CTR has likely gone unreported for years.

137. Loma Alta Creek is impaired for toxicity. Zinc and copper are highly toxic pollutants in aquatic environments, and limitations on such toxic pollutants are specifically enumerated in the CTR. 40 C.F.R. § 131.38. The Facility's discharges of these toxic metals in excess of the CTR standards cause and/or contribute to the toxicity impairments of the Loma Alta Creek.

138. Loma Alta Creek is impaired for phosphorus. Samples collected from the Facility on February 19, 2026, show the Facility driveway is a source of phosphorus. Discharges at locations more impacted by industrial activities likely contain greater concentrations of phosphorus. Because the Facility has never sampled for phosphorus itself, its potential discharge of phosphorus at levels above the Basin Plain objective have gone undetected for years.

139. The Basin Plan and CTR are applicable WQSs under the IGP.

140. Therefore, the Facility's storm water discharges containing concentrations of pollutants in excess of applicable WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the IGP.

Permit § VI.A.

141. Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the IGP Receiving Water Limitations. *See* Permit § VI.B.

142. Each time Defendant discharges polluted storm water in violation of the IGP's Receiving Water Limitations is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

143. The Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

144. The Facility has been in violation since May 15, 2021 and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**D. Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.**

145. Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

146. Generally, the SWPPP lacks required sections and an adequate analysis of the industrial processes, associated pollutants, and BMPs. *See generally* Permit § X.

147. The SWPPP fails to provide a comprehensive list of industrial processes and the narrative descriptions for these processes, both of which violate the Permit. Permit § X.G.1. For example, the SWPPP lists or alludes to the following processes: material and general waste storage, washout activities, finished product and equipment storage, and loading/unloading of trucks. *See* Ex. 1. However, the SWPPP fails to elaborate what exactly these activities entail, and where on site these activities occur. For industrial machinery and use, the SWPPP omits any required narrative description. Thus, the SWPPP fails to provide all required elements describing its industrial processes, in violation of the Permit. Permit § X.G.1.

148. The SWPPP omits a list of industrial materials, including approximate quantities, physical characteristics, and storage locations, in violation of the Permit. Permit § X.G.2.

149. The SWPPP fails to adequately analyze all pollutants associated with the industrial activities and processes, in violation of the Permit. Permit § X.G.2. Beyond the generic pollutants listed in the sampling plan, the SWPPP fails to identify any pollutants that may be present onsite, including many of the pollutants present in CERF's February 19, 2026 storm water samples of the Facility's discharge. *See* Ex. 1.

150. The SWPPP correctly identifies Loma Alta Creek as the Receiving Water. However, it fails to adequately analyze the pollutants for which Loma Alta Creek is impaired. *See* Ex. 1.

151. Though the Facility's SWPPP was updated in 2026, likely to address issues noted in Plaintiffs' Notice Letter, it still remains inadequate. For example, the SWPPP fails to note the Facility's expanded operations and footprint to take over a former neighbor's parcel. 2026 SWPPP, p. 8. Though the site map has been updated, the SWPPP fails to account for additional acreage, operations, drainage, and discharge points on the southern part of the Facility.

152. Despite the recent update, the 2026 SWPPP still fails to list or address all Loma Alta Creek 303(d) listed parameters, including Phosphorus, Pyrethroids, Bifenthrin, Cyfluthrin, Cyhalothrin, Lambda, Benthic Community Effects, Indicator Bacteria, and Nitrogen. SWPPP at 8.

153. The Facility site map also remains defective. It fails to properly show the Facility's drainage and discharge locations and the location of all industrial activities such as fueling and waste storage. Permit § X.E.3. Notably, the 2017 site map and the 2026 site map show inconsistent drainage patterns and different discharge and sampling points. The 2026 site map continues to omit the discharge at the Facility driveway and now includes a "wash area with discharge to gravel" that is not described in the SWPPP. The "wash area" constitutes an unauthorized non-stormwater discharge.

154. The 2026 site map continues to reflect that the Facility discharges storm water in one location. As detailed in Exhibit 1, the Facility discharges from multiple locations not identified in the SWPPP or site map, including at the driveway and former point of compliance at the north-east corner.

155. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the IGP and the Clean Water Act. Defendant has been in daily and continuous violation of the IGP's SWPPP requirements since at least May 15, 2021.

156. Therefore, Old School has also failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water and the subsequent discharge of pollutants from the Facility, in violation of the Permit. Plaintiffs' direct observations, and publicly available photos, strongly evidence that the Facility has failed, and continues to fail to implement even minimum BMPs.

157. These violations are ongoing and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**E. Defendant Has Failed to Develop, Implement, and/or Revise an Adequate Monitoring Implementation Plan at the Facility.**

158. Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP.

159. The Facility Owners and/or Operators have failed and continue to fail to develop and/or implement a MIP that provides for the collection of storm water samples "from each drainage area at all discharge locations" at the Facility in violation of Permit. Permit § XI.B.4. While Section XI.C.4 of the Permit allows permittees to reduce the number of locations to be sampled, there is no indication the Facility Owners and/or Operators have complied with the requirements of Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility. As detailed in Exhibit 1, the SWPPP fails to properly identify sampling locations. The SWPPP's sampling plan

includes only one sampling location, termed “Point of Compliance 1.” However, as detailed in Exhibit 1 and Section V.D, *supra*, storm water is discharged from at least three locations.

160. Further, the site map erroneously identifies one discharge location at the Facility, despite the fact that storm water and non-stormwater are discharged from multiple non-designated discharge points, including the northwestern driveway.

161. The Facility Owners and/or Operators have failed and continue to fail to sample and analyze storm water discharges for all parameters required by the Permit. CERF’s storm water sampling found high concentrations phosphorus, copper, aluminum, and manganese. These pollutants are directly associated with the Facility’s many outdoor industrial activities. Facilities with the SIC code 34XX, like Old School, are required to sample for zinc, N+N, iron, and aluminum, in addition to the parameters required by all facilities (TSS, oil and grease, and pH). In addition to these minimum requirements, the Facility must also sample and analyze parameters specific to the industrial pollutants onsite. However, because the SWPPP and pollutant source assessment are deficient, Old School fails to include numerous pollutants associated with the Facility’s industrial activities and materials in its MIP. Old School’s failure to include these parameters in the Facility’s MIP is an ongoing violation of the Permit.

162. The Facility Owners and/or Operators have also failed and continue to fail to collect the required number of storm water samples for each reporting period. The Permit requires facilities in a compliance group to collect two samples each reporting period. However, the Facility has not collected a single storm water sample since at least 2019. *See* Ex. 1, Table 1. The Facility Owners and/or Operators’ failure to collect the required number of storm water samples during each reporting period has violated and continues to violate the Permit.

163. The Permit requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. On information and belief, including the Facility’s repeated violations of Discharge Prohibitions, Effluent

Limitations, and Receiving Water Limitations, the Facility Owners and/or Operators fail to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

164. Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the IGP and the Clean Water Act.

165. Defendant has been in daily and continuous violation of the IGP's MIP requirements since at least May 15, 2021.

166. These violations are ongoing, and Defendant is subject to civil penalties for all violations of the IGP and Clean Water Act occurring since at least May 15, 2021.

## VI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

167. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

168. Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section III.C of the IGP.

169. Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the IGP.

170. Defendant has been in violation of the IGP Discharge Prohibitions at the Facility every day from at least May 15, 2021 to the present. Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

171. Each and every violation of the IGP Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties

for each and every violation of the CWA occurring from May 15, 2021 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

### Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

172. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

173. Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

174. Discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

175. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the IGP and the CWA. *See* Permit § V.A; *see also* 33 U.S.C. § 1311(b).

176. Defendant violated and continues to violate the IGP Effluent Limitations each time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

177. Defendant has been in violation of the IGP Effluent Limitations at the Facility every day from at least May 15, 2021 to the present. Defendant's violations of the IGP Effluent Limitations and the CWA are ongoing and continuous. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

178. Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

179. Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since May 15, 2021. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

**THIRD CAUSE OF ACTION**

**Discharges of Contaminated Storm Water in Violation of IGP Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

180. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

181. The Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

182. Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

183. Discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

184. Discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

185. Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the IGP and the Clean Water Act. Permit §§ VI.A–B; 33 U.S.C. § 1311(b).

186. Defendant violated and will continue to violate the IGP Receiving Water Limitations every time storm water containing levels of pollutants that adversely impact human health or the environment, or that cause or contribute to exceedances of WQSs

discharge from the Facility.

187. Defendant has been in violation of the IGP Receiving Water Limitations at the Facility every day from May 15, 2021 to the present. Defendant's violations of the IGP Receiving Water Limitations and the CWA are ongoing and continuous.

188. Defendant will continue to be in violation of the IGP and the CWA each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

189. Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

190. Defendant has been in violation of the IGP Receiving Water Limitations every day since May 15, 2021. By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA since May 15, 2021. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FOURTH CAUSE OF ACTION

### Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

191. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

192. Defendant has failed and continues to fail to develop and/or implement an adequate SWPPP for the Facility.

193. Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

194. Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of

the IGP and the Clean Water Act. *See* Permit § X; *see also* 33 U.S.C. § 1311(b).

195. Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from at least May 15, 2021, to the present. Defendant's violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

196. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

197. Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since May 15, 2021. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FIFTH CAUSE OF ACTION

### Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

198. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

199. Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

200. Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* Permit § XI; *see also* 33 U.S.C. § 1311(b).

201. Defendant has been in violation of the IGP MIP requirements every day from at least May 15, 2021, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

202. Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

203. Each day that Defendant operates the Facility without developing,

implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since May 15, 2021. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SIXTH CAUSE OF ACTION

**Failure to Properly Monitor in Violation of the IGP.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

204. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

205. Defendant has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility in violation of the IGP and the CWA. *See* Permit § XI.A; *see also* 33 U.S.C. § 1311(b).

206. Defendant has failed and continues to fail to collect and analyze the required number of storm water samples at the Facility in violation of the IGP and the CWA. Permit §§ XI.B.1–3; 33 U.S.C. § 1311(b).

207. Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* Permit § XI.B.6; *see also* 33 U.S.C. § 1311(b).

208. Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since at least May 15, 2021. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

209. Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

210. Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil

penalties for each and every violation of the CWA occurring since May 15, 2021. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## VII. RELIEF REQUESTED

Plaintiffs respectfully request that this Court grant the following relief:

a. A court order declaring the Defendant has violated and continues to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

b. A court order enjoining Defendant from discharging pollutants from the Facility to surface waters in violation of the Clean Water Act and IGP;

c. A court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the IGP and the Clean Water Act;

d. A court order assessing civil monetary penalties for each violation of the CWA at $68,445 per day per violation for violations that occurred after November 2, 2015 and assessed on or after January 8, 2025; 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

e. A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d)

f. Any other relief as this Court may deem appropriate.

Dated: August 3, 2026

Respectfully submitted,

COAST LAW GROUP LLP
By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs

COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com

SAN DIEGO COASTKEEPER
By: s/Patrick McDonough
PATRICK MCDONOUGH
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: patrick@sdcoastkeeper.org